

```
              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ALABAMA
                        SOUTHERN DIVISION

MELODY CRAWFORD,                }
                                }
     Plaintiff,                 }
                                }       CIVIL ACTION NO.
v.                              }
                                }       99-AR-815-S
AMSOUTH BANK, N.A.,             }
                                }
     Defendant.                 }
                                }
```

### MEMORANDUM OPINION

Before the court is a motion for summary judgment filed by defendant, AmSouth Bank ("AmSouth"). The motion seeks judgment as a matter of law on claimed violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, ("Title VII"), and the Civil Rights Act of 1870, as amended, 42 U.S.C. § 1981 (§ 1981"). There is no difference between the Title VII analysis and the § 1981 analysis except for the retaliation feature based only on Title VII. For the reasons set forth herein, defendant's motion is due to be granted.

### Pertinent Facts

The plaintiff, Melody Crawford ("Crawford") began working for AmSouth in March of 1992. In 1994 and again in 1995, Crawford, a



black female, filed EEOC charges complaining about a failure to promote and retaliation. The EEOC found that it could not conclude that AmSouth had committed violations of Title VII, and issued to Crawford her "right-to-sue" in April of 1997. Crawford did not sue.

In August of 1997, with no suit having been filed, AmSouth promoted Crawford to the position Teller Supervisor I, supervising the drive-thru tellers. On the same day, Lisa Hardy ("Hardy"), a white female with substantially less experience than Crawford, was also promoted to the position of Teller Supervisor I, supervising the lobby tellers. Persons in the position of Teller Supervisor I whether in a lobby or in a drive-thru location received the same salary.

In November of 1997, several months after Hardy and Crawford were promoted, Deborah Thomas ("Thomas") assumed the position of Branch Manager over the branch in which Hardy and Crawford were employed. In February of 1998, Thomas made a change to the job status of Hardy. Because Hardy was supervising ten tellers, Thomas adjusted her status to Teller Supervisor II in order to bring her into compliance with bank policy. Those who supervise more than six tellers are supposed to be in the category of Supervisor II. This adjustment did include a pay raise because of the larger

2

number of tellers being supervised, but in other respects, the job of Teller Supervisor II is the same level supervisor as Teller Supervisor I. This adjustment of pay and job title was not given to Crawford, because Crawford supervised only the two tellers at drive-thru.

In April of 1999, Crawford and three black co-plaintiffs brought suit in this court charging race discrimination. They invoked only § 1981 because they had not exhausted their EEOC prerequisites. The other three plaintiffs were swiftly thereafter successful in resolving their disputes with AmSouth by settlement, the terms of which are not revealed. Crawford did not reach a settlement. Instead, her lawyer was granted leave to withdraw, and a new lawyer appeared for her.

After the filing of her complaint, Crawford was written up for a number of violations of bank policy. Crawford disputes the seriousness of these violations. She claims that the reprimands were retaliatory and pretextual. AmSouth, on the other hand, claims that they were simply examples of an even-handed execution of standard bank policy.

At the end of August, 1999, Crawford filed her First Amendment to the Complaint, adding charges of retaliation, unfair disciplinary practices, and unfair loss of bonuses. By this

3

time she had a new right-to-sue and invoked Title VII as well as § 1981. Crawford's amendment was at least partly based on the incidences of being written up that occurred earlier in the year.

On November 3, 1999, Crawford was demoted from Teller Supervisor to Teller based on a number of alleged performance lapses, corresponding at least in part to the violations for which she was written up earlier in the year. The decision was made after Thomas, the Branch Manager, sought approval from her boss, Rena Ramsey ("Ramsey"). Ramsey, a black female, and Vice President of Human Relations, in turn consulted with the legal department due to Crawford's pending lawsuit claiming retaliation. The decision to demote Crawford was made by the group. Again, Crawford disputes the validity of her alleged performance lapses and claims that her demotion was in retaliation for her lawsuit.

Not long after her demotion Crawford was terminated. The circumstances surrounding the termination are largely in dispute. Crawford, not unexpectedly, claims that it was retaliatory. AmSouth claims, instead, that Crawford, when informed of the decision to demote her, blew up at Susan Ellis ("Ellis"), Crawford's supervisor at the time, with a barrage of profanity and legal threats directed against AmSouth, including that AmSouth would either "pay me now, or pay me later."

4

Ramsey attempted to contact Crawford shortly after this incident. Crawford refused to speak to Ramsey without having Crawford's attorney present. Later, when AmSouth decided against allowing a meeting with Crawford's attorney, Ramsey called Crawford to inform her that a decision on her case would be made without her input unless she would speak to her, Ramsey. Crawford spoke to Ramsey then and denied the allegations of threats and profanity. Ramsey thereupon made a credibility determination that Ellis was the one telling the truth about the incident, and that Crawford was not. Crawford was terminated. Cussing and hollering at a supervisor and then lying about it is an offense that carries termination as the penalty in most workplaces.

On December 17, 1999, Crawford filed a Second Amended Complaint, charging that she was terminated for pretextual reasons in retaliation for filing her discrimination lawsuit.

### Discussion

Crawford offers no direct evidence of race discrimination against her or anyone else at AmSouth. Instead, she claims that enough circumstantial evidence of discrimination exists to give a jury a justification for finding federally proscribed conduct by

AmSouth. Accordingly, it is the *McDonnell-Douglas*[1] burden-shifting test that provides the structure for analysis of her claims. Crawford must first make a *prima facie* case of discrimination.[2] If Crawford can make her *prima facie* case, AmSouth can respond with a legitimate, non-discriminatory explanation for its actions. Crawford can then attempt to show that the explanation offered by AmSouth is nothing more than a pretext.

I. <u>Promotion Claims</u> [3]

a.) <u>Chris Leech's promotion to Customer Service</u>

---

[1] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973).

[2] There are a number of variations of the *prima facie* case under the *McDonnell-Douglas* test, depending on whether the issue at hand is about hiring, or promotion, pay, termination, etc. But the central point in all is that the plaintiff must show that a similarly situated individual received better treatment when compared to the plaintiff, and that the plaintiff is a qualified member of a protected class.

[3] Crawford's brief in opposition to AmSouth's motion for summary judgment is basically a list of propositions that Crawford alleges is contained in AmSouth's brief in support of its motion for summary judgment. Each of these propositions is rebutted by Crawford. One problem with Crawford's brief is that she rebuts propositions that were never, in fact, forwarded by AmSouth at all. One such proposition rebutted by Crawford is that "Plaintiff did not get promotions because she was not college trained." The court cannot find anywhere in AmSouth's brief the assertion that a lack of college training represents AmSouth's stated reason for denying Crawford promotions. Thus, the court does not understand Crawford's list of employees who received promotions without college training, as if these represent comparators that support Crawford's claim of discriminatory treatment. The court is aware from reading Crawford's deposition that she claims that she was told by AmSouth that college training was needed for promotions. But Crawford is representing in her brief that it is AmSouth itself that is using this as its stated explanation for why Crawford was not promoted. Crawford is presenting these "rebuttals" in her response in opposition to the motion for summary judgment, implying that they are rebuttals to arguments actually found in the motion for summary judgment. This is a distortion of the record, it distracts the court, and it does not aid Crawford.

6

Representative.

Crawford cannot make her *prima facie* case on this claim. Crawford has wholly failed to demonstrate that she was qualified for the position of Customer Service Representative to which Chris Leech was promoted. This is proven conclusively by the fact that Crawford acknowledges in her deposition that she did not want the job. Crawford cannot be heard to complain about failing to receive a promotion she never sought and admits that she did not want. Additionally, AmSouth correctly points out that this particular claim is time-barred. Leech received his promotion to Customer Service Representative in January of 1996. Crawford did not make this claim to the EEOC, nor did she file her lawsuit within two years of the date of the promotion.

b.)   Chris Leech's promotion to Branch Manager.

Chris Leech was qualified for the position of Branch Manager, whereas Crawford was not. Crawford cannot make her *prima facie* case on this claim, any more than she did in her other claim of discriminatory treatment favoring Leech. The Branch Manager is responsible for all aspects of bank activities, including both the teller side and the sales side. After Leech had been a teller for almost two years, he gained experience on the sales side of the

7

bank's activities through his position as a Customer Service Representative. Furthermore, Leech was Assistant Branch Manager for 16 months prior to his promotion to Branch Manager. Crawford, in comparison, had experience only on the teller side. She had no sales experience. To allow Crawford to proceed on this claim would be to say that a member of a protected class can complain if a member of another class gets a job for which he or she has proven experience that the member of the protected class does not have.

c.) <u>Lisa Hardy's "promotion" to Teller Supervisor II.</u>

The court is troubled by the circumstances surrounding the change of job status for Hardy to Teller Supervisor II. Crawford was more experienced than Hardy when both of these women were promoted to Teller Supervisor I. Yet, Hardy was given the Teller Supervisor I position over the lobby tellers, while Crawford was called upon to supervise two tellers in the drive-thru window two blocks away. Why was this selection made? Would it have made more sense to put the more experienced employee in the more responsible position? Were AmSouth's motives pure? Can AmSouth contend that these two "equal" promotions were really equal? Did AmSouth not understand that the Teller Supervisor in the lobby would have greater prospects for career advancement than the drive-thru supervisor? The court finds that this division of labor is so

8

anti-intuitive, with a novice white employee getting the arguably better position over the black employee with more years of experience, that these circumstances could constitute enough circumstantial evidence of race discrimination to make out a jury case of discrimination.  However, Crawford does not make this claim.  Perhaps she concluded that she could not convince a jury that there was anything to complain about in supervising a drive-thru instead of a lobby crew.  Perhaps she preferred the drive-thru.  The court does not know the reasons, but the court can only respond to claims made.  A potential claim that the court detects was, in fact, never made, and this court is not called upon to invent theories and to suggest strategies for litigants.

Crawford focuses on a later incident, when a new Branch Manager came in and adjusted the job status of Hardy, the lobby supervisor, to reflect the bank policy of paying supervisors more when they supervise over six employees.  When Hardy's status was changed to Teller Supervisor II with the higher pay grade, this change did not involve any new responsibilities, and Hardy did not supervise any new employees as a result of the change.  She simply received the pay that bank policy required for the job she was already doing.  Crawford insists that this change of status to Supervisor II was a "promotion."  Crawford mischaracterizes facts

9

and deposition testimony in an awkward attempt to make a claim where there is none.[4] Crawford senses that something is wrong about the disparate treatment of her in relation to Hardy, and the court might have agreed had her claim been about her assignment to the drive-thru, but the court cannot patch together a claim for Crawford when she made none for herself; neither in her brief nor in her complaint.

II. <u>Miscellaneous Unequal Treatment Claims</u>

a.) <u>Backup teller</u>

Crawford claims that if she had been assigned a backup teller like the other supervisors, she would have been more effective on the job and may not have had problems with some of the things for

---

[4] For example, Crawford, in her brief, claims that Hardy admitted in her deposition that the change of status to Supervisor II was a "promotion." This is not accurate. When Hardy speaks of her "promotion" in the pages cited to by Crawford, Hardy is talking about the promotion she received in 1997 to Supervisor I; the same promotion Crawford received. The deposition transcript is entirely clear on that point. Moreover, Hardy describes this promotion to Supervisor I as her "only promotion" at the bank, further demonstrating that Hardy did not consider the change of status to Supervisor II to be a promotion. Hardy deposition at 30-33. Crawford next claims that Hardy, in Hardy's deposition at pages 17, 18, and 30, acknowledges that she, Hardy, was placed over Crawford in a supervisory position after being at the bank for only seven or eight months. This is simply invented out of whole cloth by Crawford here. There is nothing in those pages that resembles such an acknowledgment from Hardy. It is almost as if Crawford expects that the court would not read the transcript at all. When Hardy speaks of her promotion to Teller Supervisor at page 30, she is clearly referring to the promotion to Teller Supervisor I, the same promotion Crawford received on the same day. There is no good faith basis for Crawford's claim here that Hardy is acknowledging on those pages that she was promoted to become Crawford's supervisor. When Crawford mischaracterizes the facts and deposition testimony she distracts the court and, more importantly, she does not aid her cause.

which she was written up. The court can find no evidence that any supervisor was assigned a backup teller. Crawford claims that Hardy, in Hardy's deposition, admitted that Christie Davis was her "backup teller." In fact, Hardy testifies that "She (Davis) was not considered a backup teller" but only helped cover things when Hardy was out. Hardy deposition at p. 50.

Crawford claims that the Branch Manager, Deborah Thomas, turned down Crawford's request for a backup teller. In fact, as Crawford acknowledges in her deposition, Thomas only refused to allow more than one employee to have the combination to the safe at the drive-thru, and that this was done to protect Crawford. Crawford also acknowledges that she could have trained her subordinates to cover for her to the extent she wished, without interference from Thomas. Crawford deposition pp. 136-139. The court simply finds no evidence that Crawford was denied a backup teller when others were assigned one. The court does note that Crawford, in her deposition, clearly appears to **believe** that all the other supervisors received backups when she did not. But the court cannot accept beliefs without more. Without some testimony or statistical evidence to support her "belief," Crawford's opinions do not create genuine issues of material fact.

 b.) <u>Missed Bonuses, Etc.</u>

In her complaint Crawford also made some additional claims of unequal treatment with respect to missed bonuses, failure by management to include her in various training programs, unequal pay claim, etc. In her brief in opposition to AmSouth's motion for summary judgment, Crawford did not address these claims. To avoid summary judgment, a party may not rest on the allegations of the complaint alone. *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995). Accordingly, the court finds that these claims, to the extent they may have existed, have been abandoned.

III. <u>Written Warnings</u>.

a.) <u>Infractions discovered during the cash audit of the drive-thru.</u>

There were a number of infractions found during an audit. In her brief Crawford first argues that the infractions were minor, and that she was singled out for more severe scrutiny and discipline than white employees who committed similar infractions. The only comparator she offers is Judy Leach. In fact, Leach was demoted from the Teller Supervisor position at the drive-thru for very similar infractions, so the court cannot find that Leach is a comparator who helps Crawford.

Crawford next argues, with respect to the audit, that "apparently Francis Tidwell decided to do a surprise visit and

12

write Plaintiff up for everything she could find." There is no evidence to support this allegation, so the court cannot consider it. Crawford asks the court to reach an independent determination that the infractions found in the audit were not really "serious" and that the AmSouth was using them as a pretext, with retaliation for Crawford's lawsuit as the true motivation for finding them. Again, Crawford offers no comparators or statistics to demonstrate that such infractions are not really considered serious in the banking business. The infractions involved such examples as miscounted and misplaced funds, failure to sign reports for which Crawford was responsible, etc. The court cannot, independently, determine that these admitted infractions would ordinarily be considered minor in the banking business. Bare, unsupported opinions and allegations are not sufficient to create a genuine issue of material fact.

    b.) <u>The incident with the employee bringing her children to work at the drive-thru</u>.

Crawford claims that she was unfairly blamed for an incident when an employee brought her children to work at the drive-thru window. That employee worked with her children at the window the whole day, even bringing them back with her after lunch. Crawford claims that she called Thomas, the Branch Manager, and left several

13

messages seeking guidance and support with respect to possible discipline for the employee. Crawford claims that she did not have authority to discipline the employee, and that Thomas did not return repeated phone calls.

AmSouth claims that as the drive-thru supervisor, Crawford should have dealt with the problem, and that allowing children to sit with an employee all day at the teller window is a serious breach of bank policy. AmSouth argues that the bank is entirely justified in holding the drive-thru supervisor responsible for this incident.

Again, Crawford asks the court to disagree with AmSouth's assessment and allow a jury to conclude that Crawford was disciplined excessively for this incident. Yet Crawford offers no testimony from a knowledgeable source confirming that she did not have authority to deal with employees under her supervision. She only states that this was her impression. Crawford offers the deposition testimony of Hardy, and claims that Hardy acknowledged that she, Hardy, also did not have disciplining authority in the like position of Teller Supervisor over the lobby tellers. Again, the actual transcript does not support this interpretation. This is Hardy's testimony:

Q. As their supervisor, could you write them up if they did

14

> something against AmSouth policy and it required them to be written up?
>
> A.  I did not write up, no.  I would go and talk to Debra and that would be her decision.  I never wrote up anybody.
>
> Q. Did you have the authority to, if you needed to write that up?
>
> A. I really can't answer that, because I never done it.  I mean, I might, but then I might not have.  I really can't say.
>
> Q.  Was it your decision to use the process of you going to Debra and letting Debra make the decision or did somebody tell you, you had to do that?
>
> A.  No, ma'am, that was my decision.

Hardy deposition at 36.

Based on this testimony it appears possible that Crawford was under the impression that she had to go to her supervisor before disciplining an employee.  But there is no evidence that this was, in fact, bank policy.  Crawford is asking this court to find that AmSouth acted unreasonably when it expected that Crawford, as supervisor of the drive-thru tellers, should have handled an employee who brought her children to sit with her at the teller window all day, even bringing the children back after lunch.  The court cannot permit a finding that the bank acted unreasonably in this way.  With large sums of cash around, any bank would reasonably consider it quite serious to have children of employees behind the teller window.

15

III. <u>Demotion and Termination</u>

Crawford was demoted to teller from her position as drive-thru teller supervisor due to the infractions of bank policy discussed above, and she was terminated immediately thereafter because, AmSouth claims, she reacted to the news of her demotion with profanity and hollering. Crawford denies that she reacted that way.

Crawford includes in her evidentiary submissions affidavits and deposition testimony in which a variety of individuals claim that Crawford was a nice person, everyone loved her, hollering and profanity were entirely against her nature, etc., etc. As counsel for both parties must surely be aware, this material is irrelevant. The key question, as always in such a situation, is whether the decision-makers acted reasonably and in good faith when the decision to terminate was made.[5] Ramsey made a credibility determination that Ellis was telling the truth about the incident and that Crawford was not. As Crawford herself points out, there were no witnesses, so the decision-maker had to make a credibility

---

[5] *Elrod v. Sears, Roebuck & Co.*, 939 F 2d. 1466, 1470 (11th Cir. 1991) quoting *Smith v. Papp Clinic, P.A.*, 808 F.2d 1449, 1452-53 (11th Cir.1987) ("[I]f the employer fired an employee because it honestly believed that the employee had violated a company policy, even if it was mistaken in such belief, the discharge is not 'because of race' and the employer has not violated § 1981.").

16

determination based on the information available. Ramsey, who is black, explained that she made the decision because, among other reasons, she actually observed Ellis immediately after the incident with Crawford and that Ellis was visibly shaken and upset; Crawford would not speak to Ramsey after the incident without Crawford's attorney; when Crawford did speak she did not appear credible to Ramsey; Crawford had time, in Ramsey's estimation, to think about the incident and to prepare a response; and Crawford was unable to suggest any reason why Ellis would have invented the story.

In the final analysis there appears to be no reason to believe that Ramsey was making a bad faith decision for pretextual or retaliatory reasons when she terminated Crawford. There is no room for this court to allow a jury to second-guess Ramsey's decision.

### Conclusion

The court must acknowledge that it has a certain unease about this case. The court is aware that race discrimination can be difficult to prove, and that African Americans and other minorities must sometimes deal with subtle manifestations of bias. Melody Crawford had eight years experience in the banking business. Yet, she did not make much progress in her career at AmSouth Bank. When two employees were both promoted on the same day to Teller Supervisor I, the white employee with eight months experience was

placed over the lobby tellers, while Crawford, with eight years experience, was assigned two blocks away to supervise two tellers at the drive-thru. With respect to bonuses, Crawford abandoned her claim, but apparently, at one time, all tellers shared in the bonuses handed out when customers signed up for new services. That policy was changed by Thomas to require an employee to have six referrals before the employee could participate in the bonuses. But the tellers at the drive-thru, for a variety of reasons, did not have the kind of customer contact required to generate as many referrals, so they were, in effect, cut out of the bonus program. The court is somewhat bothered by this evidence, but there is no racial component or comparators to explain it as an act of racial discrimination.

    Crawford has submitted affidavits of individuals who testified that in their perception Crawford was unfairly treated. Several of the affiants claim that racist and derogatory comments were made by Crawford's supervisors behind her back. For at least two reasons these affidavits cannot help Crawford. First, it is evident that these employees were not working at the bank during the relevant time periods and thus cannot have knowledge of the actions and motivations of the decision-makers at issue here; and second, because the statements in the affidavits are too lacking in

18

specifics to be of probative value to Crawford.[6] While the opinions and anecdotes contained in these affidavits cannot help Crawford survive summary judgment, they do, perhaps, provide an explanation of why Crawford has spent six years pursuing her claims. There can be no doubt that Crawford herself has the perception that she was the victim of race discrimination. She believes it, but so do a lot of employees of other employers in the United States who expect more of Title VII and § 1981 than those statutes provide.

Although the court is not unsympathetic to Crawford, she simply has not made her case. And, the court cannot let itself be influenced by the fact that Crawford refused to settle when her co-plaintiffs did. Whether or not the other three cases would have survived summary is irrelevant to Crawford's separately considered case. Defendant's motion for summary judgment will be granted by separate order.

DONE this 14th day of June, 2000.

_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE

---

[6] AmSouth's motion to strike the affidavits will be denied, but even when the affidavits are included, they will not help Crawford.